# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

SHARON D. STARGEL,        )
                                     )
        **Plaintiff,**         )
                                     )
      **v.**                 )        **CAUSE NO.: 1:07-CV-277**
                                     )
MICHAEL J. ASTRUE,       )
**Commissioner of Social Security,** )
                                   )
        **Defendant.**       )

## OPINION AND ORDER

Plaintiff Sharon D. Stargel appeals to the District Court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1]  (*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Stargel applied for DIB on August 5, 2004, alleging that she became disabled as of January 30, 2004.  (Tr. 58-60.)  The Commissioner denied her application initially and upon reconsideration.  (Tr. 34-35, 39-41, 43-47.)  On December 11, 2006, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Stargel, who was represented by counsel, Stargel's husband, and a vocational expert ("VE") testified.  (Tr. 214.)  On March 30, 2007, the ALJ rendered an unfavorable decision to Stargel.  (Tr. 13-25.)  Stargel submitted a request for review to the Appeals Council, which the Appeals Council denied (Tr. 4-12), making the ALJ's decision the final decision of the Commissioner.

Stargel filed a complaint with this Court on November 7, 2007, seeking relief from the

---

[1]All parties have consented to the Magistrate Judge.  *See* 28 U.S.C. § 636(c).

Commissioner's final decision.  (Docket # 1.)  She argues that the ALJ improperly evaluated her ability to stand and/or walk during an eight hour work day; the credibility of her symptom testimony; and the opinion of her treating physician, Dr. Dale Economan.  (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3  ("Opening Br.") 10, 11, 14.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

Stargel was fifty-two years old at the time of the ALJ's decision.  (Tr. 25, 58.)  She had a college education (Tr. 71) and approximately fifteen years of past work experience as a director of religious education.  (Tr. 68-69, 73-74, 99, 218, 232-35.)  In her Disability Report, she alleged lower back surgery (Tr. 67), and further described her impairments in her Opening Brief as post disc replacement surgery at L4-5 and L5-S1, degenerative lumbar disc disease, scoliosis, mild degenerative changes in the cervical spine, cervical spondylosis at C5-C6 and C-6-C7, and depression (Opening Br. 2).

### B. Summary of Relevant Medical Evidence

Stargel saw Dale Economan, D.O., in 2003 and underwent testing for lower back pain. (Tr. 124.)  In April 2004, Dr. Economan's diagnosis was "LDS" and insomnia (Tr. 121) and they discussed a disc replacement surgery in Germany (Tr. 120), which Stargel ultimately underwent in June 2004 (Tr. 114-18).  Dr. Economan reported on June 21, 2004, that her recovery was good.  (Tr. 118.)  In July and August 2004 Stargel continued to report improvement, denying having pain like before her surgery.  (Tr. 112-13.)  Dr. Economan adjusted Stargel's

---

[2] The administrative record in this case is 239 pages, and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

medications, decreasing the OxyContin dosage but adding Lortab for breakthrough pain. (Tr. 112-13.)

Dr. Economan's records note that on August 16, 2004, Stargel called in to request a refill on Celexa, and the prescription was phoned in to the pharmacy. (Tr. 111.) Another phone message follows, dated the same day, indicating that the pharmacist called and voiced concern because Stargel had requested a refill on Celexa even though her supply should have lasted through September 1. (Tr. 111.) The insurance company denied the prescription. (Tr. 111.) The notes further indicate that the nurse called Stargel and admonished her to take the medicine as prescribed. (Tr. 111.) Stargel stated that "she knew better" and would call the office if there was a problem. (Tr. 111.) The note then states that Stargel called the next day explaining that she lost her three month supply, and a prescription was written and filled. (Tr. 111.)

On September 10, 2006, Stargel returned to Dr. Economan for bilateral lower leg pain, and her husband reported that she was "very emotional." (Tr. 110.) Her medications were adjusted, including discontinuing the Celexa and continuing the OxyContin. (Tr. 110.) On October 15, Stargel returned to the doctor after sustaining a fall and underwent an x-ray of the left and right knees, both revealing mild degenerative changes. (Tr. 107-08.) A lower back x-ray was also performed, showing disc space prosthesis at the L4-5 and L5-S1 levels, early degenerative changes, and scoliosis. (Tr. 106.) Stargel underwent an MRI of the lumber spine a week later which indicated no evidence of foraminal or spinal stenosis. (Tr. 105.)

On October 2, 2004, Noe Marandet, M.D., performed a consultative physical exam. (Tr. 101.) Stargel described the surgery she underwent in Germany and stated that it helped her back tremendously, although she still experienced some lower back pain radiating into both legs. (Tr.

101.)  Stargel also told Dr. Marandet that she needed help with household chores but was able to perform all her activities of daily living.  (Tr. 101.)  On physical exam, Stargel had some difficulty getting on and off the examination table but did not use an assistive device.  (Tr. 101.)  Her gait was antalgic and slow but sustainable.  (Tr. 102.)  She was unable to stand on heels and toes or squat, and the range of motion in her lumbar spine was markedly decreased.  (Tr. 102.)  She also had tenderness over the lumbosacral spine.  (Tr. 102.)  Her straight-leg raising test was positive at 30 degrees on both sides.  (Tr. 102.)  Dr. Marandet also reported that Stargel had full motor strength, intact handgrip, and normal fine finger movements, and that her neurological exam was normal.  (Tr. 102.)  Dr. Marandet's impression was status post disc replacement surgery and degenerative disc disease of the lumbosacral spine.  (Tr. 102.)

On October 23, 2004, Dr. R. Fife, a non-examining State Agency physician, completed a Physical Residual Functional Capacity Assessment form.  (Tr. 144-51.)  Dr. Fife found that Stargel could occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand or walk at least two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; and needed to avoid concentrated exposure to wetness, vibration, and hazards such as machinery and heights.  (Tr. 151.)  A second state agency physician affirmed this opinion on December 30, 2004.  (Tr. 151.)

On October 30, 2004, Dr. J. Pressner, a non-examining State Agency psychologist, completed a Psychiatric Review Technique form, finding that Stargel had no severe mental impairment.  (Tr. 128-41.)  Dr. Pressner noted that she did not allege depression, the medical evidence did not indicate depression, and she denied any limitations due to depression.  (Tr.

140.)  A second state agency psychologist affirmed this opinion on December 30, 2004.  (Tr. 128.)

On March 4, 2005, Dr. Economan ordered an x-ray on Stargel's lower back due to pain as a result of a fall.  (Tr. 188.)  The results were unchanged from the October 2004 exam.  (Tr. 188.)  On March 16, 2005, Stargel underwent a CT/MR of the lumbar spine which revealed that the disc space prostheses at the L4-5 and L5-S1 disc levels appeared intact and in appropriate position.  (Tr. 189.)  The exam also showed a small end plate depression involving the inferior end plate at the L3 level, with a small adjacent Schmorl's node end plate irregularity.  (Tr. 189.)

Stargel visited Dr. Economan again in March, May, and June 2005 because she wanted to adjust her medication.  (Tr. 164-66.)  On one visit she reported that her pain was better but she was still getting emotional.  (Tr. 165.)

Stargel returned to Dr. Economan on August 9, 2005, reporting that her back pain was worse and that she frequently woke up at night and had right leg numbness.  (Tr. 163.)  An MRI of her lumbar spine performed the next day indicated similar results as the October 22, 2004, test, and also revealed desiccation and degeneration of the L3-4 disk with mild disk bulging, but no foraminal or spinal stenosis.  (Tr. 187.)  An August 30, 2005, EMG was consistent with possible chronic, residual, denervating L5 radiculopathy, but indicated no evidence of peroneal or tarsal tunnel entrapment, neuropathy, polyneuropathy, or myopathic process.  (Tr. 176.)

In September 2005, Stargel reported to Dr. Economan that she continued to experience back pain, and she underwent a cervical spine x-ray revealing mild multi-level degenerative changes of the mid and lower cervical spine.  (Tr. 162, 182.)  In November, Stargel underwent a series of tests.  A November 1, 2005, MRI of the cervical spine showed cervical spondylosis

with disc bulging at C5-6 and C6-7, but the cervical spinal cord appeared normal. (Tr. 186.) A November 21, 2005, MRI of the lumbar spine showed mild scoliosis and that her disc prostheses at the L4-5 and 5-1 level appeared to be appropriately positioned. (Tr. 183.) A CT/MRI post myelogram only added a finding of facet arthritis at the lumbosacral level with no bony destructive lesions or paraspinal abnormalities. (Tr. 184.) A myelogram of the lumbar spine on the same date again showed evidence of the disc replacement surgery and no abnormalities save for mild bulging of the 3-4 disc. (Tr. 185.)

On December 12, 2005, Stargel visited Dr. Economan and he indicated that Stargel's pain was better than before the surgery and walking did not hurt, but vaccuming and bending did. (Tr. 160.) However, lying down improved the pain. (Tr. 160.)

Stargel visited Dr. Economan in March, June, and September 2006 continuing to report pain and anxiety, and her medications were regulated. (Tr. 154-58.) On one occasion she complained of prolonged neck spasms. (Tr. 154.) An October 4, 2006, a MRI of the cervical spine showed degenerative disc disease and cervical spondylosis at C5-C6 and C6-C7 and noted that overall there was no change from the previous study. (Tr. 177.)

On December 7, 2006, Dr. Economan provided a Medical Source Statement. (Tr. 194-200.) The diagnosis was lumbar disc disease and his prognosis was fair to poor. (Tr. 194.) Dr. Economan described Stargel's symptoms as low back pain with radiculopathy at L4-5 and L5-S1, elaborating that she has intense low back pain and leg pain requiring narcotics that is aggravated by standing, bending lifting, twisting, and sitting. (Tr. 194.) He found that emotional factors contribute to the severity of her symptoms and functional imitations, and that depression secondary to her chronic pain and medication had psychological effects on her

condition.  (Tr. 195.)  In describing her treatment and side effects, Dr. Economan noted that she is treated with narcotics with secondary confusion, drowsiness, and depression, affecting her cognitive ability and organization skills including domestic tasks.  (Tr. 195.)  He responded that her pain was constant and would frequently affect her attention and concentration, and that she is incapable of even low stress jobs.  (Tr. 196.)  He also found that Stargel could lift and carry less than three to four pounds, and that she could sit and stand/walk for less than two hours total in an eight-hour work day.  (Tr. 197-98.)  He noted that she needs to shift positions at will.  (Tr. 198.) Dr. Economan also indicated that she had significant limitations in her ability to do repetitive reaching, handling, or fingering, and that she would miss work more than four times a month due to her medical condition.  (Tr. 199-200.)

From February to November 2006, Stargel also sought treatment at Life Counseling Center Service, where she visited Brian M. Warner, M.A., L.C.S.W., a school psychologist, on about a monthly basis for depression and issues related to her chronic pain.  (*See* Tr. 192, 201-13.)  Mr. Warner observed in his initial mental status examination of Stargel that she was neat and clean and had an appropriate affect but a dysphoric mood.  (Tr. 212.)   He noted that her memory, cognition, and attention were unimpaired and that she was alert with fair insight, good judgment, and above average intellect.  (Tr. 212.)  His notes from the monthly sessions indicate Global Assessment of Functioning (GAF) scores ranging from 55 to 60,[3] and contain statements

---

[3]GAF scores reflect a clinician's judgment about the individual's overall level of functioning.  American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*  A GAF score of 61 to 70  reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well."  *Id.*  And, a GAF score of 71 to 80 reflects that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors" and

that Stargel was doing well, was stable, and that she reported improvement.  (Tr. 203-09.)  The monthly notes also regularly indicated good or fair prognoses.

On November 20, 2006, Mr. Warner provided a report of his treatment of Stargel.  (Tr. 192-93.)  He explained that Stargel was taking a number of medicines for her chronic pain, depression, sleep problems, and focus and attention problems.  (Tr. 192.)  He found that because of the unpredictability of her health; her restrictions sitting, standing, and lifting; and her significant difficulties with managing her health problems, the likelihood of gainful employment was extremely doubtful.  (Tr. 192.)  Mr. Warner also noted that Stargel experienced a great deal of depression because she wants to be productive but essentially is "unemployable."  (Tr. 192.)  His prognosis was that recovery is unlikely.  (Tr. 193.)  He also elaborated, "Emotionally, [Stargel] is being treated for anxiety, depression, and attention-related issues with a great deal of pain and physical discomfort."  (Tr. 193.)

### C.  Summary of Hearing Testimony

Stargel testified at the hearing that she used to work for a child evangelism fellowship, which involved traveling to ten counties to train adults and work with children.  (Tr. 218.)  She explained that she stopped working because of her back pain, which led her to seek a disc replacement surgery in Germany in 2003.  (Tr. 218-19.)  She testified that she had seen her treating physician, Dr. Economan, for about ten years.  (Tr. 219.)  Stargel also explained that when she takes her medications she cannot think as clearly, and that she had to back off some of her medications because they caused her to act irrationally.  (Tr. 221, 225-26.)

In describing her typical day, Stargel said that after she gets up in the morning she takes

---

indicates "no more than slight impairment in social, occupation, or school functioning."  *Id.*

her medicine and moves around until the pain subsides. (Tr. 221.) She then showers and sits and reads for about fifteen minutes. (Tr. 221-22.) She also stated that she does housework, but must stop and rest in between tasks, lying down. (Tr. 222.) Stargel related that she cannot cook at the stove for more than fifteen minutes without her back beginning to spasm. (Tr. 222-23.) She also testified that she can drive and can ride in a car for about fifteen to twenty minutes before stopping, and that she drives short distances daily. (Tr. 223-24.) She elaborated that if she and her husband are traveling a longer distance, she makes a bed in the van and lies down. (Tr. 223.)

Stargel estimated that she could stand for about fifteen minutes to do a task, sit for about fifteen to twenty minutes, and could not walk very far on concrete but does better on softer surfaces. (Tr. 226.) She explained that her husband does most of the shopping, and that she uses a stool to help her do the laundry and has assistance carrying it. (Tr. 227.) She said that the heaviest thing she carries is her purse. (Tr. 228.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227

F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5)

whether the claimant is incapable of performing work in the national economy.[4]  *See* 20 C.F.R. §

404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer

leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.

*Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other

than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The

burden of proof lies with the claimant at every step except the fifth, where it shifts to the

Commissioner.  *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

The ALJ rendered his decision on March 30, 2007.  (Tr. 16-25.)  At step one of the

five step analysis, he found that Stargel had not engaged in any substantial gainful activity since

her alleged onset date.  (Tr. 19.)  At step two, he found that Stargel had a severe impairment of

degenerative disc disease.  (Tr. 19.)  At step three, the ALJ determined that Stargel did not have

an impairment or combination of impairments that meet or equal a listing.  (Tr. 19.)  Before

proceeding to step four, the ALJ found that Stargel has the following RFC: "[T]he claimant has

the [RFC] to lift and/or carry 20 pounds occasionally and 10 pounds frequently.  She can sit 6

hours per 8 hour day, and stand and/or walk 6 hours per 8 hour day.  She must avoid

concentrated exposure to wetness, vibration, dangerous machinery, and unprotected heights."

(Tr. 20.)  The ALJ also concluded that although Stargel's "medically determinable impairments

could have been reasonably expected to produce the alleged symptoms," her "statements

concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. § 404.1520(e).

credible." (Tr. 21.)

Based on this RFC and the VE's testimony, the ALJ found at step four that Stargel is able to perform her past relevant work as a director of religious education. (Tr. 23.) Alternatively, he found at step five that a significant number of jobs exist in the national economy for someone with her age, education, work experience, and RFC, such as sales attendant, office helper, and mail sorter. (Tr. 24.) He further determined that she could perform the office helper and mail sorter jobs even under the added limitation of a sit/stand option with an ability to sit or stand for thirty minutes at a time. (Tr. 24-25.) Therefore, Stargel's claims for DIB were denied. (Tr. 25.)

*C. The ALJ's Error in His Evaluation of Stargel's Ability to Stand and/or Walk Is Harmless.*

Stargel argues that the ALJ committed reversible error in finding that she could stand and/or walk six hours during an eight-hour work day. (Opening Br. 10.) Stargel explains that this finding is contrary to all the medical opinions of record, and specifically, the reviewing state agency physicians' finding that Stargel could stand and/or walk at least two hours of an eight-hour work day. (Opening Br. 10.) Stargel submits that the ALJ's finding is unsupported and that he failed to articulate a basis for discounting the reviewing physicians' opinions on this point. *See* SSR 96-8p ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

Although Stargel's argument has merit, ultimately the ALJ's misstep does not constitute reversible error. The VE testified that a hypothetical individual with Stargel's RFC could perform her past work as a director of religious education as she actually performed it, at the light work level, *or* as it is performed in the national economy, which would be in the *sedentary*

range.[5]  (Tr. 235-36.)  Thus, even had the ALJ gone so far as to adopt the state agency physicians' greater standing and walking limitation, Stargel would not be precluded from performing her past relevant work at the sedentary level.  *See* 20 C.F.R. § 404.1560(b)(2), (3) (stating that a claimant is not disabled if she is able to perform her past relevant work, "either as the claimant actually performed it *or* as generally performed in the national economy") (emphasis added); SSR 82-61.

In fact, Stargel even conceded in her reply brief that the ALJ's step four analysis would not change had the ALJ properly evaluated the state agency physicians' opinion.  (Reply Br. 2.) As a result, the ALJ's failure to articulate why the state agency physicians' greater standing and walking restriction was not adopted is harmless error not warranting a remand.  *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

### D.  The ALJ's Credibility Determination Will Not Be Disturbed.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  If an ALJ's determination is grounded in the record, and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988), creating "an accurate and logical bridge from the evidence to [the] conclusion," *Steele v.*

---

[5]In addition, the VE testified that Stargel's skills would transfer to other sedentary jobs, such as bookkeeper and receptionist.

*Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal quotation and citation omitted), his determination will be upheld unless it is "patently wrong."  *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ engaged in a lengthy and thorough credibility analysis, exploring the various C.F.R. § 404.1529(c) factors, such as Stargel's testimony with respect to the pain in her backs and legs, *see* 20 C.F.R. § 404.1529(c)(3)(ii), the medication she takes, *see* 20 C.F.R. § 404.1529(c)(3)(iv), her daily activities and ability to complete household chores, *see* 20 C.F.R. § 404.1529(c)(3)(i), and measures she takes to alleviate the pain, such as lying down and using a contour pillow, *see* 20 C.F.R. § 404.1529(c)(3)(vi).  (Tr. 20-21.)  The ALJ then determined, based on his review of all the evidence of record, that Stargel has medically determinable impairments that could reasonably be expected to produce the alleged symptoms, but that her "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms are not entirely credible."  (Tr. 21.)  In so finding, the ALJ articulated three reasons grounded in the record: that her past prescription medication abuse adversely affected her credibility; that her allegations about her depression were inconsistent; and that the objective medical evidence undermined her allegation of extreme limitations, suggesting that she exaggerated her complaints.  Stargel finds fault with two of these reasons and then nitpicks the ALJ's determination in two additional ways.

Stargel first challenges the ALJ's reasoning that her record of abusing her medication "draws her credibility into question" (Tr. 21), arguing that this reasoning is erroneous because

Dr. Economan indicated that she was not a malingerer and there is evidence that she ceased

abusing her medications on her own. (Opening Br. 12-13.) Although this may be true, it does

not controvert the fact that she *did* abuse her medications at one time. Indeed, the ALJ cited to

the record of Stargel's attempt to obtain an early medication refill and her admission to Mr.

Warner that she had a history of abusing Oxycontin. (Tr. 21, 111, 213.) That Stargel's

credibility is compromised due to her past of manipulating her doctor and pharmacy to receive

medication is logic that is easily traced, *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004);

*Clifford*, 227 F.3d at 872 (explaining that the ALJ is not required to consider every piece of

evidence, as long as his path of reasoning can be traced), and because the record supports the

ALJ's reasoning, his determination is not "patently wrong," *see Getch v. Astrue*, 539 F.3d 473,

483 (7th Cir. 2008) ("Reviewing courts . . . should rarely disturb an ALJ's credibility

determination, unless that finding is unreasonable or unsupported.").

   Stargel also takes issue with the ALJ's reasoning that her allegations about her

depression were inconsistent, claiming that the ALJ did not follow SSR 96-7p's mandate that the

ALJ review the case record to determine whether there is an explanation for the variation in her

reports about her symptoms. (Opening Br. 13.) While the ALJ pointed out inconsistencies

between her statements about her mental condition,[6] he did not overlook possible explanations.

In fact, contrary to Stargel's assertions, he specifically considered that during her treatment with

_____

   [6]Specifically, the ALJ noted that her October 2004 report that her depression did not interfere with her activities of daily living or social functioning conflicted with her hearing testimony that she had considerable problems with mental functioning; that she only recently sought mental health treatment, indicating that Dr. Economan's prescriptions were sufficient to control her psychological symptoms; and that Mr. Warner's mental status examination revealed no memory impairment and that she was alert, showed good judgment, and had an appropriate affect despite her dysphoric mood. (Tr. 21.) The ALJ also highlighted that her focus and sleep problems were treated with medications, and that Mr. Warner's "observations of normal cognitive functioning are inconsistent with the claimant's testimony that her medications were making her say and do irrational things." (Tr. 21.)

Mr. Warner "she was having some difficulty dealing with recent situational stressors at that time, including the death of her father and difficulties with her daughter. She was also having some difficulty dealing with chronic pain." (Tr. 21.) Thus, the ALJ did consider explanations for her reportage, but ultimately concluded that given the numerous inconsistencies, her problems were not as extreme as she portrayed. Although Stargel is dissatisfied with the ALJ's conclusion, it is for the ALJ, not this court, to weigh the evidence and determine questions of credibility. *See Powers*, 207 F.3d at 434-35.

Stargel further contends that the ALJ selectively reviewed the evidence in failing "to evaluate how her mental condition worsened her physical symptoms and functioning." (Opening Br. 12.) Specifically, Stargel asserts that the ALJ failed "to consider the combined effects" of her physical and mental impairments, pointing to Dr. Economan's finding that depression affected her physical condition and functional limitations. (Opening Br. 12 (citing Tr. 195; *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006); *Gentle v. Barnhart*, 430 F.3d 865, 868-69 (7th Cir. 2005)).) However, the ALJ specifically explained that the RFC by definition considers "all of the claimant's impairments, including impairments that are not severe." (Tr. 17 (citations omitted).) Furthermore, the ALJ thoroughly addressed Stargel's mental condition in his opinion, penning several paragraphs describing her testimony concerning its effect on her life, the evidence about the effect of her medications on her mental and physical conditions, and her counseling sessions with Mr. Warner. (*See* Tr. 19-22.)

Indeed, contrary to Stargel's assertion, the ALJ took into account the combined effects of Stargel's physical and mental impairment throughout his opinion. The ALJ *specifically addressed* Dr. Economan's findings that Stargel "could not perform the full range of even

16

sedentary exertion due to her combination of mental and physical problems." (Tr. 23.) In so evaluating, the ALJ properly discounted Dr. Economan's opinion, as explained *infra*. He also considered testimony "that she could not think clearly due to side effects from some of her pain medications," noting that "she was out of it most of the time, so she tried not taking as much medication[,]" and that despite having difficulty focusing, her Concerta was "helpful to her." (Tr. 19, 20.) He *explicitly observed* that Stargel stated that "the worst of her memory and concentration problems [are related to] being sedated by her pain medications, which have been changed to minimize this side effect" (Tr. 20), and that as a result of her medication, she is sleepy and less alert. (Tr. 20.) Furthermore, the ALJ *expressly acknowledged* Stargel's testimony "that her medications were making her say and do irrational things[,]" finding it inconsistent with Mr. Warner's February 2006 mental status exam observing normal cognitive functioning. (Tr. 21.) In short, the ALJ certainly did not turn a blind eye to the combined effects of Stargel's mental and physical conditions, and subsequently did not err when assessing them. *Compare Clifford*, 227 F.3d at 873 ("The ALJ, rather than blind himself to this condition (and other relevant evidence), should have considered the [obesity] issue with the aggregate effect of her other impairments."), *with Johnson v. Barnhart*, 449 F.3d 804, 807 (7th Cir. 2006) ("[T]here is no indication that in assessing [the claimant's] joint problems the administrative law judge gave insufficient weight to the effect on them of [the claimant's] obesity, which is anyway not extreme."). Thus, Stargel's argument fails to demonstrate a basis for remand.

Lastly, Stargel maintains that the ALJ erred by neglecting to discuss the claims representative's remarks that she was "slow to stand and walked slower than normal." (Tr. 65-66; Opening Br. 14.) *See* SSR 96-7p (explaining that when reviewing the consistency of the

claimant's statements, the ALJ must consider factors including "[t]he consistency of the individual's statements with other information in the case record," including "any observations recorded by SSA employees in interviews"). However, an ALJ "need not provide a written evaluation of every piece of evidence that is presented," *Scheck*, 357 F.3d at 700 (internal quotation marks and citation omitted), as long as the reviewing court is able "to trace the path of the ALJ's reasoning[,]" *Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996) (internal quotation marks and citation omitted). In this instance, the claims representative's remark fails to contradict the ALJ's findings. In fact, the ALJ concluded that Stargel indeed has a severe back impairment, accounting for some difficulty walking, just not to the degree she alleged.[7] (Tr. 21.) Because the claims representative's observations did not conflict with the ALJ's conclusion, the ALJ did not err in not addressing them.

"[A]n ALJ's credibility assessment will stand 'as long as [there is] some support in the record[.]" *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). In sum, Stargel's attacks on the thorough and adequately supported credibility assessment amount to a nitpick of the ALJ's analysis. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it") (internal quotation marks and citations omitted), and accordingly, the credibility determination will not be

---

[7]Stargel also misconstrues the claims representative's notes, arguing that they indicate a memory problem because she could only name one doctor. (Opening Br. 14.) But the claims representative never indicated that she had a memory problem; he said that she "would only give the one doctor[']s name" and that he "explained she could send [him] the name and addresses of any other doctors she wanted contacted[.]" (Tr. 66.) He did state that "she did not know the name of the doctor in Germany and unsure of spelling of city[,]" but the observation that she did not recall specific foreign names and spellings does not amount to a statement that she had debilitating memory problems.

disturbed.

*E.  The ALJ Properly Evaluated the Opinion of Stargel's Treating Physician, Dr. Economan.*

Stargel takes issue with the ALJ's analysis of the opinion of Dr. Economan, Stargel's treating physician who opined that she has severe limitations.  (Opening Br. 14-15; Tr. 195-99.) Stargel maintains that the ALJ erred by failing to specify precisely what weight he accorded Dr. Economan's opinion, and that his reasoning was otherwise unsupported by the record.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and  circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books*, 91 F.3d at 979.  The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion.

*Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).

Stargel asserts that the ALJ erred by failing to indicate the specific weight he gave to Dr. Economan's opinion.  To be sure, the ALJ did not completely reject the opinion, finding that Stargel had a severe back impairment, but he disagreed about the extent of the severity and accorded more weight to the state agency doctors' opinion.  Thus, it is ascertained that the ALJ gave Dr. Economan's opinion *some* weight, but less than what he gave the state agency doctors' opinion.  Given that, as we will discuss, the ALJ articulated reasoning why Dr. Economan's opinion was not entitled to controlling weight and he properly analyzed the 20 C.F.R. § 404.1527(d) factors, we see no reversible error on this point.

Despite Stargel's attack on the ALJ's reasoning, substantial evidence supports the ALJ's determination.  First, the ALJ explained that Dr. Economan's opinion was not entitled to controlling weight because it was inconsistent with other substantial evidence – the state agency physician's findings that Stargel "could perform the lifting requirements of light work and that she could stand and walk at least 2 hours per 8 hour day."  (Tr. 23.)  Furthermore, the ALJ also considered various applicable 20 C.F.R. § 404.1527(d) factors, having discussed the various tests that Dr. Economan ordered and procedures he recommended to address Stargel's back trouble (Tr. 22), and acknowledging that Dr. Economan was Stargel's treating physician.  *See* 20 C.F.R. § 404.1527(d)(ii) (explaining that the nature and extent of the treatment relationship is a factor to be considered).  Yet, the ALJ ultimately found that the factors of supportability, *see* 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."), and consistency, *see* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is

with the record as a whole, the more weight we will give to that opinion."), warranted the assignment of less weight to Dr. Economan's opinion than that of the state agency physicians.

To elaborate, the ALJ articulated specific reasons explaining why he discounted Dr. Economan's opinion, first emphasizing that the record did not support Dr. Economan's conclusion that Stargel had significant mental limitations.  (Tr 23.)  Indeed, the ALJ had highlighted the state agency psychologists' opinion that Stargel had no severe mental impairment (Tr. 22), he had thoroughly explored Mr. Warner's treatment notes reflecting normal cognitive functioning and general improvement (Tr. 21), and he had discussed how Stargel's own reports reflected minimal to no limitation due to psychological problems (Tr. 19).  Thus, the ALJ's reasoning on this point is grounded in the record.

The ALJ then reasoned that Dr. Economan's significant limitations on Stargel's fingering and grasping abilities was unsupported because there was no impairment necessitating such limitations, indicating that Dr. Economan appeared to merely be repeating Stargel's subjective complaints.  (Tr. 23.)  *See Rice*, 384 F.3d at 370-71 ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.").  Stargel insists that this reasoning is erroneous, because Dr. Economan stated in another portion of his assessment that her medication affects her motor skills.  However, what Dr. Economan actually said was, "Pain meds cause flushing. [Stargel] has [secondary] psychological effects limiting cognitive functioning, reasoning, problem solving, and motor skills."  (Tr. 200.)  Thus, Dr. Economan's statement does not specifically support or explain the extreme fingering and grasping limitations he suggested, and beyond this vague reference to secondary psychological effects on her motor skills, Stargel points to no evidence of

an impairment requiring such restrictions. Given that the record otherwise reflects normal handgrip, normal fine finger movements, and normal ability to handle small objects and button buttons on clothing (Tr. 102), the ALJ's reasoning on this point is easily traced.

Furthermore, the ALJ explained that Dr. Economan's opinion was inconsistent with other medical evidence of record, namely, the opinion of the state agency physicians that Stargel could perform various tasks between light and sedentary work. (Tr. 23.) *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) ("An ALJ . . . may discount a treating physician's medical opinion if . . . the opinion is inconsistent with the opinion of a consulting physician . . . , as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.") (internal quotation marks and citation omitted). The ALJ emphasized that the state agency physicians based their opinion upon their review of Dr. Marandet's report, and that it was consistent with the evidence that Stargel's back pain improved after her surgery and was managed with medications (Tr. 23), and "[a]n ALJ must only minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Berger*, 516 F.3d at 545.

In this instance, the ALJ adequately analyzed the relevant regulatory factors and provided specific reasons, supported by the record, for assigning Dr. Economan's opinion less weight than the state agency physicians' opinions. Accordingly, the ALJ's evaluation of Dr. Economan's opinion withstands review.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

Clerk is directed to enter a judgment in favor of the Commissioner and against Stargel.

SO ORDERED.

Enter for this 31st day of October, 2008.

S/Roger B. Cosbey

Roger B. Cosbey,
United States Magistrate Judge
